UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA

| | |
|---|---|
| LESA G.[1], | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) CIVIL NO. 3:21cv132 |
| | ) |
| KILOLO KIJAKAZI, Acting | ) |
| Commissioner of Social Security, | ) |
| | ) |
| Defendant. | ) |

OPINION AND ORDER

This matter is before the court for judicial review of a final decision of the defendant Commissioner of Social Security Administration denying Plaintiff's applications for Disability Insurance Benefits (DIB) under Title II of the Social Security Act, 42 U.S.C. § 423(d), and for Supplemental Security Income (SSI) under Title XVI of the Act, § 1383(c)(3). Section 205(g) of the Act provides, inter alia, "[a]s part of his answer, the [Commissioner] shall file a certified copy of the transcript of the record including the evidence upon which the findings and decision complained of are based. The court shall have the power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the case for a rehearing." It also provides, "[t]he findings of the [Commissioner] as to any fact, if supported by substantial evidence, shall be conclusive. . . ." 42 U.S.C. §405(g).

The law provides that an applicant for disability benefits must establish an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or

---

[1] For privacy purposes, Plaintiff's full name will not be used in this Order.

mental impairment which can be expected to last for a continuous period of no less than 12 months. . . ." 42 U.S.C. §416(i)(1); 42 U.S.C. §423(d)(1)(A). A physical or mental impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. §423(d)(3). It is not enough for a plaintiff to establish that an impairment exists. It must be shown that the impairment is severe enough to preclude the plaintiff from engaging in substantial gainful activity. *Gotshaw v. Ribicoff*, 307 F.2d 840 (7th Cir. 1962), cert. denied, 372 U.S. 945 (1963); *Garcia v. Califano*, 463 F.Supp. 1098 (N.D.Ill. 1979). It is well established that the burden of proving entitlement to disability insurance benefits is on the plaintiff. *See Jeralds v. Richardson*, 445 F.2d 36 (7th Cir. 1971); *Kutchman v. Cohen*, 425 F.2d 20 (7th Cir. 1970).

Given the foregoing framework, "[t]he question before [this court] is whether the record as a whole contains substantial evidence to support the [Commissioner's] findings." *Garfield v. Schweiker*, 732 F.2d 605, 607 (7th Cir. 1984) citing *Whitney v. Schweiker*, 695 F.2d 784, 786 (7th Cir. 1982); 42 U.S.C. §405(g). "Substantial evidence is defined as 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rhoderick v. Heckler*, 737 F.2d 714, 715 (7th Cir. 1984) quoting *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1410, 1427 (1971); *see Allen v. Weinberger*, 552 F.2d 781, 784 (7th Cir. 1977). "If the record contains such support [it] must [be] affirmed, 42 U.S.C. §405(g), unless there has been an error of law." *Garfield*, *supra* at 607; *see also Schnoll v. Harris*, 636 F.2d 1146, 1150 (7th Cir. 1980).

In the present matter, after a hearing, the Administrative Law Judge ("ALJ") made the following findings:

2

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2022.

2. The claimant has not engaged in substantial gainful activity since November 25, 2017, the alleged onset date (20 CFR 404.1571 *et seq*., and 416.971 *et seq*.).

3. The claimant has the following severe impairment: interstitial cystitis (20 CFR 404.1520(c) and 416.920(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5. After careful consideration of the entire record, the undersigned finds the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) subject to the following additional limitations: The claimant is able to occasionally climb, balance, kneel, crawl, stoop, or crouch. She can never climb ladders, ropes or scaffolds. She must avoid concentrated exposure to moving machinery and unprotected heights.

6. The claimant is capable of performing past relevant work as an Invoice Control Clerk, a General Inspector, and a Wire Inspector. This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565 and 416.965).

7. The claimant has not been under a disability, as defined in the Social Security Act, from November 25, 2017, through the date of this decision (20 CFR 404.1520(f) and 416.920(f)).

(Tr. 12-20).

Based upon these findings, the ALJ determined that Plaintiff was not entitled to benefits, leading to the present appeal.

Plaintiff filed her opening brief on November 9, 2021. On December 21, 2021 the defendant filed a memorandum in support of the Commissioner's decision to which Plaintiff replied on January 13, 2022. Upon full review of the record in this cause, this court is of the view that the Commissioner's decision should be remanded.

A five step test has been established to determine whether a claimant is disabled. *See Singleton v. Bowen*, 841 F.2d 710, 711 (7th Cir. 1988); *Bowen v. Yuckert*, 107 S.Ct. 2287, 2290-91 (1987). The United States Court of Appeals for the Seventh Circuit has summarized that test as follows:

> The following steps are addressed in order: (1) Is the claimant presently unemployed? (2) Is the claimant's impairment "severe"? (3) Does the impairment meet or exceed one of a list of specific impairments? (4) Is the claimant unable to perform his or her former occupation? (5) Is the claimant unable to perform any other work within the economy? An affirmative answer leads either to the next step or, on steps 3 and 5, to a finding that the claimant is disabled. A negative answer at any point, other than step 3, stops the inquiry and leads to a determination that the claimant is not disabled.

*Nelson v. Bowen*, 855 F.2d 503, 504 n.2 (7th Cir. 1988); *Zalewski v. Heckler*, 760 F.2d 160, 162 n.2 (7th Cir. 1985); accord *Halvorsen v. Heckler*, 743 F.2d 1221 (7th Cir. 1984). In the present case, Step 4 was the determinative inquiry.

Plaintiff was born on October 29, 1966. (Tr. 55). At the time of her alleged onset date, she was 51 years old. *Id*. Plaintiff has a high school education. (Tr. 39). She has past work as a hand packager, an invoice control clerk, a general inspector, a wire inspector, and a commercial institutional cleaner. (Tr. 19).

Plaintiff saw family medicine physician Rhonda Sparks on June 25, 2016 for left-sided lower back pain that had developed that day with urinary frequency and urgency. (Tr. 458). Dr. Sparks assessed acute cystitis with hematuria. (Tr. 459). Plaintiff then saw primary care physician Rebecca Case on August 22, 2016 for low back discomfort and urinary frequency in the context of a history of recurrent urinary tract infections. (Tr. 413). Testing indicated that her urine was

clear with no sign of infection, so Dr. Case interpreted the pain as acute left-sided low back pain and prescribed Naprosyn. (Tr. 414). Plaintiff returned to Dr. Case on September 12, 2016, having awoken with pain and experiencing dysuria and urinary frequency/urgency. (Tr. 417). Dr. Case prescribed Cipro for a urinary tract infection. *Id*. Plaintiff then saw family medicine physician Svetlana Hagan on December 10, 2016 for another occurrence of dysuria. (Tr. 462).

Primary care nurse practitioner Kara Yackee saw Plaintiff on June 17, 2017 to address concerns related to frequent urination. (Tr. 465). Plaintiff said that she had 10 to 12 urinary tract infections a year. *Id*. Plaintiff saw Dr. Sparks again on August 5, 2017 for decreased and painful urination, pelvic pressure, and nausea. (Tr. 472). Plaintiff saw Dr. Case on September 1, 2017, to address symptoms of another urinary tract infection. (Tr. 421). Dr. Case prescribed Cipro and assessed interstitial cystitis. (Tr. 422).

Plaintiff presented to gynecologist Craig Hanson on November 16, 2017 to further address her history of recurrent urinary tract infections. (Tr. 435). Urology labs were collected. *Id*. A cystometrogram performed on November 22, 2017 was apparently normal, so further testing was ordered. (Tr. 524). A complete renal ultrasound on November 27, 2017 was also normal. (Tr. 526-27). Plaintiff returned to Dr. Hanson on December 14, 2017 with complaints of burning and painful urination, urine leakage, urinary frequency, and flank pain. (Tr. 435). Urine dip that day was negative, and she had not had any positive urine cultures. *Id*. Further urinalysis and cystoscopy were planned. (Tr. 437-38).

The cystoscopy with hydrodistension and placement of a pudendal block solution was performed on January 5, 2018; this procedure also confirmed the diagnosis of interstitial cystitis with petechial hemorrhages seen throughout the bladder. (Tr. 441). Plaintiff saw Dr. Hanson

postoperatively on January 24, 2018. (Tr. 549). She had no significant symptoms following surgery. *Id*. Dr. Hanson diagnosed pudendal neuralgia and interstitial cystitis. (Tr. 550). By February 8, 2018, Plaintiff was again experiencing urinary frequency and urgency with bloating. (Tr. 553). She presented to her gynecologist's office on that same date for the administration of a rescue solution by catheter for simple irrigation of the bladder. (Tr. 555-56). She followed up with Dr. Hanson again on March 28, 2018, reporting that she had symptom improvement but considerable abdominal bloating. (Tr. 563).

Plaintiff next saw NP Yackee on May 9, 2018 for dysuria and lower abdominal pain starting that morning. (Tr. 477). She followed up with Dr. Hanson on May 17, 2018 with complaints of bladder discomfort, dysuria, flank pain, and frequency. (Tr. 582). She had another rescue solution, which "really helped," and returned to Dr. Hanson on May 23, 2018 with a complaint of "heaviness" over her bladder area but no further pain. (Tr. 586). Plaintiff followed up with Dr. Hanson on August 29, 2018, reporting that she still had some bladder spasms, with worsening fecal urgency and loose stools after meals. (Tr. 698). She declined a rescue solution that day. *Id*. However, in response to another flare, a rescue solution was administered on September 4, 2018. (Tr. 717-18).

Dr. Kyung In Yang conducted a consultative examination of Plaintiff on September 14, 2018. (Tr. 721). Dr. Yang noted suprapubic tenderness and left lumbosacral tenderness on examination. (Tr. 722-23). Plaintiff informed Dr. Yang that she was applying for disability benefits due to intermittent symptoms from interstitial cystitis, with symptoms two to three days out of the week usually lasting for about 30 minutes. Dr. Yang concluded in part that Plaintiff was "able to stand/walk at least 2 hours in an 8 hour day. Patient is able to lift over 10 pounds

6

occasionally. Patient is able to lift under 10 pounds frequently." *Id*.

In between consultative examinations, another rescue solution was administered on October 1, 2018. (Tr. 760).

Dr. Russell Coulter-Kem conducted a psychological consultative examination of Plaintiff on October 31, 2018. (Tr. 726). Plaintiff described a "somber" mood, and Dr. Coulter-Kem said that her affect was consistent with this reported mood. (Tr. 727). Plaintiff could recall two of the last three presidents of the United States, she could recall two out of three words after a five minute delay, and she was able to repeat five digits forward and three digits backward. (Tr. 728). She was able to answer three out of four calculations. She seemed to interpret proverbs somewhat literally and could not clearly explain reasons why food needed to be cooked ("because [it's] raw and can make you sick") or why some professions need a license ("it could be bad if they treated somebody if they didn't have a license"). She could not accurately state the number of seconds in a minute or identify a definition of the Equator. *Id*. Nonetheless, Dr. Coulter-Kern acknowledged only "mild difficulty maintaining attention and concentration," "some difficulty responding appropriately to supervision and coworkers in a work setting," and "some difficulty coping appropriately to work pressures." Dr. Coulter-Kem assessed a mild anxiety disorder. (Tr. 729).

Plaintiff returned to her gynecologist's office for follow-up of her interstitial cystitis on November 12, 2018. (Tr. 733). She asked for a rescue solution because of a return of bladder pain and urinary frequency over the previous night. *Id*. Another rescue solution was administered. (Tr. 761). Yet another rescue solution was provided on November 19, 2018. (Tr. 770). On December 7, 2018, Dr. Hanson performed a bilateral pudendal block. (Tr. 737). Then, another rescue

solution was provided on December 18, 2018. (Tr. 832). Plaintiff saw Dr. Hanson for postoperative follow-up the following day, complaining of dysuria, nausea, and vaginal pressure. (Tr. 833). Dr. Hanson provided Macrobid, and Plaintiff reported doing better on January 2, 2019. (Tr. 839).

Plaintiff presented to primary care physician Chester Rogers on February 7, 2019 to establish care. (Tr. 862). She complained of upper abdominal pain that was improving by the time of the visit. *Id*. She appeared "quite anxious" and had mild upper abdominal tenderness on examination. (Tr. 863). Because of the longstanding anxiety and associated depression symptoms (including occasional crying spells, some sadness, and mild irritability), Dr. Rogers started her on Zoloft. *Id*. Dr. Rogers saw Plaintiff on February 21, 2019 to follow up on depression; she was unable to tolerate an increase to 50 mg of Zoloft but noted improvement with 25 mg. (Tr. 856). She followed up with Dr. Rogers again on July 23, 2019. (Tr. 850). She said she was doing better with Zoloft, now taking the full dose of 50 mg, and denied any anxiety or irritability. She said she had two syncopal episodes earlier in the year, both preceded by lightheadedness. *Id*.

Plaintiff saw Dr. Hanson on July 31, 2019, complaining of moderate bladder discomfort for months. (Tr. 895). Yet another rescue solution for simple irrigation of the bladder was administered on July 31, 2019. (Tr. 892). A rescue solution was again administered on August 8 and August 12 of 2019. (Tr. 900, 902). Most recently in the record, Plaintiff complained of dysuria and flank pain to Dr. Hanson on May 1, 2020. (Tr. 949).

At the hearing before the ALJ, Plaintiff testified that during a flare-up of interstitial cystitis, she alternated between sitting on the toilet and lying on the couch in pain. (Tr. 40-41). Flares typically lasted from a day up to a week. (Tr. 42). She had rescue solutions when the flares

did not go away after a day. *Id*. She said she had bladder irrigations performed specifically to help with her ability to void. (Tr. 41). Plaintiff estimated having urinary tract infections about four to five times a month. *Id*.

The VE testified that Plaintiff's past work included a composite job with duties of both a hand packager and an invoice control clerk, as well as jobs as a general inspector, a wire inspector, and an institutional cleaner. (Tr. 46-47). The ALJ asked about jobs available for an individual limited to light work with occasional climbing, balancing, stooping, kneeling, crouching, and crawling; no climbing of ropes, ladders, and scaffolds; and avoidance of concentrated exposure to moving machinery and unprotected heights. (Tr. 47-48). The VE said that the past jobs of invoice control clerk, general inspector, and wire inspector were still jobs Plaintiff could perform, as generally performed. The VE also identified other light jobs available in the national economy. (Tr. 48). The VE said that there were no transferable skills to sedentary work. The ALJ asked about tolerances for being off-task, and the VE answered, "A hypothetical individual would need to be on task to maintain employment." *Id*. The ALJ asked about an individual who was off task 15% or more of the workday, and the VE said that such an individual would be reprimanded and, if it continued, likely terminated. (Tr. 48-49). The VE said that even one absence in the first three to six months would result in reprimand and, if repeated, likely termination. (Tr. 49). If an individual needed longer breaks or more breaks than the standard breaks (a fifteen minute break in the first and second part of the day with a half-hour lunch in the middle), then this "would affect their ability to complete tasks and maintain productivity and would result in termination." (Tr. 49-50).

Plaintiff's representative asked about the impact of a requirement to be near a bathroom,

and the VE said, "I believe that would be along the lines of an accommodation. They might not have the ability to leave the job and be in close proximity say in a warehouse." (Tr. 51). Plaintiff's representative asked for further clarification on absence tolerances, and the VE said that employers generally tolerated no more than eight absences a year, but even consistently missing one day a month would result in termination after six months. *Id*.

In support of remand, Plaintiff argues that the ALJ erred in her evaluation of the medical opinion provided by Plaintiff's treating gynecologist by offering no more than a perfunctory and insufficient explanation as to why she rejected this opinion, and failing to recognize the evidence in support of the opinion or the consistency of the opinion with the opinions of the consultative examiners. For claims filed after March 27, 2017, as is the case here, the Social Security Administration provides that its adjudicators must weigh medical source statements under the rules set out in 20 C.F.R. §§ 404.1520c and 416.920c. "The RFC assessment must always consider and address medical source opinions. If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted." SSR 96-8p.

The agency's regulations require an ALJ to consider any medical opinions provided by a medical source using several factors, including supportability, consistency, relationship with the claimant, and specialization. 20 CFR 416.920c (c) (1) – (5). The most important factors considered when determining the persuasiveness of a medical source opinion are supportability and consistency. 20 CFR 416.920c (b) (2). Therefore, an ALJ must "explain how [they] considered the supportability and consistency factors for a medical source's opinions . . . in [the claimant's] determination or decision." An ALJ may explain how they considered the other

10

factors, but this is not required. *Id*. Where opinions are equally well-supported and consistent with the record, the agency explains that an examining relationship should be considered as a factor in favor of an opinion because a "medical source may have a better understanding of [a claimant's] impairment(s) if he or she examines [the claimant] than if the medical source only reviews evidence in [the claimant's] folder." 20 CFR 416.920c (c)(3) (v). Furthermore, a treating relationship may demonstrate that a "medical source has a longitudinal understanding of [the claimant's] impairment(s)," taking into account subfactors like the length of the treatment relationship, the frequency of examinations, the purpose of the treatment relationship, and the extent of the treatment relationship. 20 CFR 416.920c (c) (3) (i) – (iv). It is well-settled that to enable meaningful review, an ALJ must build a logical and accurate bridge between evidence and conclusions. *Terry v. Astrue*, 580 F.3d 471, 475 (7th Cir. 2009); *Roddy v. Astrue*, 705 F.3d 631, 636 (7th Cir. 2013).

Dr. Hanson provided a medical source statement on November 25, 2019. (Tr. 907-10). Dr. Hanson indicated that when Plaintiff experienced a flare, she would frequently experience symptoms severe enough to interfere with the attention and concentration needed to perform even simple work tasks. (Tr. 908). Dr. Hanson opined Plaintiff could sit or stand 45 minutes at a time but could only sit, stand, and walk less than two hours total in an eight-hour workday. (Tr. 909). He said she needed a job that permitted shifting positions at will and that permitted ready access to a restroom. He said she would need unscheduled restroom breaks as many times as she thought she needed and would have to be away from the work station for as long as she needed to void; depending on her specific symptoms, she could have as little as 30 seconds of advance notice of the need for a restroom break. *Id*. He limited her to lifting 10 pounds frequently, 20

11

pounds occasionally, and 50 pounds rarely. (Tr. 910). He said she could occasionally twist, stoop, crouch, climb ladders, and climb stairs. He estimated that she would be absent from work as a result of her impairments or treatment about four days per month. *Id*.

The ALJ found Dr. Hanson's opinion to be "partially persuasive," asserting that he "overall did not provide supportive comments for his opinions." (Tr. 17).The ALJ listed all of Plaintiff's treatment visits with Dr. Hanson going back to 2017, which was reflective of the longitudinal treatment Plaintiff received. The ALJ noted that "[Dr. Hanson] saw [Plaintiff] during 16 of those 33 months" and sometimes saw her more frequently than once a month. (Tr. 17). The ALJ rejected Dr. Hanson's opinion on Plaintiff's ability to tolerate "low stress" jobs because "this term is not vocationally defined in the questionnaire and regardless appears outside his area of expertise." (Tr. 17). She rejected his limitation regarding the ability to sit, stand, or walk because "the claimant herself asserts[ that] outside of flares she is able to perform a wide variety of exertional activity on what seems to be an unlimited basis." The ALJ nonetheless found other exertional and postural limitations to be "more persuasive"—without even attempting to reconcile how she could simultaneously find that Plaintiff had an essentially "unlimited" exertional ability and yet find that Plaintiff was limited to light work. The ALJ offered no explanation at all for rejecting Dr. Hanson's proffered limitations related to flares or urinary frequency other than opining that his estimated absence frequency was "inconsistent with the claimant's history of requiring rescue solution irrigation procedures for symptom flares." Plaintiff notes, however, that the rescue solution irrigation would not represent the only time in which she would be absent as a result of her impairments or treatment, as she needed to visit her doctors for routine visits and also follow-up for her interstitial cystitis, anxiety and depression. *Id*.

12

Plaintiff argues that she and her treating gynecologist are in the best position to comment on the specific limitations warranted during a flare-up. Plaintiff contends that the record supports that the frequency of absences would exceed the eight absences allowed a year per the VE's testimony. (Tr. 51). Plaintiff notes that even the frequency of the procedures alone, without consideration of Dr. Hanson's opinion on absences, suggests a work-preclusive number of absences over the course of a year. Furthermore, Plaintiff's frequent reports of urinary frequency and urgency in gynecology notes (Tr. 413, 417, 435, 458, 465, 553, 582, 733) support Dr. Hanson's requirement that she be allowed unscheduled restroom breaks at will for variable length and with as little as 30 seconds of advance notice. (Tr. 909). Plaintiff argues that, being able to divert to the restroom at any moment, with virtually no advance notice, would be disabling as the VE testified that providing close proximity to a bathroom was an accommodation, longer or more frequent breaks would be work-preclusive, and most employers required employees to be on task at least 85% of the time. (Tr. 48-51). Thus Plaintiff concludes that there was more than enough evidence to support Dr. Hanson's opinion.

This Court agrees with Plaintiff that he ALJ's rejection of Dr. Hanson's opinion is not supported considering the overwhelming evidence that is consistent with and supportive of Dr. Hanson's opinion— evidence largely arising out of the many treatment records from Dr. Hanson's own office. As noted above, consistency and supportability are the two most important factors when weighing medical opinions. 20 CFR 404.1520c (b) (2). However, if two or more medical opinions are both equally well-supported, then the other factors should also be considered. 20 CFR 404.1520c (b) (3). A treating relationship, especially a longer treatment relationship with a greater frequency of visits, typically deserves more weight because such a

13

treating relationship suggests a greater longitudinal understanding of the impairments. 20 CFR 404.1520c (3) (i) – (ii). A more extensive treatment relationship, specifically focused on the relevant impairment, with a great deal of testing ordered by a specialist, can demonstrate a greater level of knowledge. 20 CFR 404.1520c (3) (iii) – (iv). A medical source who is a specialist in the relevant medical area may be more persuasive, as well. 20 CFR 404.1520c (c) (4). All of these factors weigh in favor of a treating gynecologist who has provided regular specialist care with relevant testing and procedures to address interstitial cystitis since November 2017. Since Dr. Hanson's opinion is supported by and consistent with the medical evidence of record, it is unclear why the ALJ did not find the opinion persuasive.

The ALJ also rejected any limitations suggested by the psychological examiner. The ALJ opined that the examination was "grossly normal" except for a "somber mood." (Tr. 14). The ALJ also held that Dr. Coulter-Kern "did not give an elaborate opinion on her functioning, only making conclusory statements . . . . He gave no supportive comments or explanation for his conclusions." *Id*. However, to reach this decision, the ALJ had to ignore a variety of abnormal findings, including difficulties with recall, some trouble with calculations, concrete proverb interpretation, difficulty clearly answering judgment-related questions, and some fund of knowledge gaps. (Tr. 728). These findings appear to support "mild difficulty maintaining attention and concentration" at the least. (Tr. 729). Such a limitation is consistent with Dr. Hanson's assessment of attention and concentration issues, which he indicated were variable and could increase to frequent interference during a flare. (Tr. 908). *Barnett v. Barnhart*, 381 F.3d 664, 669 (7th Cir. 2004). An "ALJ can reject an examining physician's opinion only for reasons supported by substantial evidence in the record; a contradictory opinion of a non-examining

14

physician does not, by itself, suffice." *Gudgel v. Barnhart*, 345 F.3d 467 (7th Cir. 2003) (citing *Moore v. Barnhart*, 278 F.3d 920, 924 (9th Cir. 2002)).

As the ALJ failed to sufficiently explain her rejection of Dr. Hanson's medical opinion, the decision to deny benefits is not supported by substantial evidence and must be remanded.

## Conclusion

On the basis of the foregoing, the Decision of the Commissioner is hereby REVERSED AND REMANDED for further proceedings consistent with this Opinion.

Entered: January 27, 2022.

s/ William C. Lee<br>
William C. Lee, Judge<br>
United States District Court